**In the Matter of SCHAFER'S BAKERIES for the Reorganization of a Corporation.**

**No. 36060.**

United States District Court
E. D. Michigan, S. D.

Sept. 30, 1957.

---

See also D.C., 129 F.Supp. 82.

Levin, Levin, Garvett & Dill, Detroit, Mich., Archie Schimberg, Chicago, Ill., for petitioning creditor, Woodward Commercial Corp.

Butzel, Levin, Winston & Quint, Detroit, Mich., Eckhart, Klein, McSwain & Campbell, Chicago, Ill., for the Creditors' Committee, interveners.

FREEMAN, District Judge.

This is a petition in a Chapter X reorganization proceeding under the Bankruptcy Act of 1898 (11 U.S.C.A. §§ 501–676), as amended, by Woodward Commercial Corporation (hereinafter called Woodward), a secured creditor, requesting that the court enter an order directing the trustee to pay Woodward the sum of $15,775.06, representing amounts claimed to be due and owing as the result of certain obligations entered into between the debtor organizations and Woodward, as hereinafter set forth.

The debtor organizations are composed of Schafer's Services, Inc., Schafer's Kalamazoo Bakery, Inc., and four other Schafer corporations, all being an integral part of a common enterprise known as Schafer's Bakeries engaged in operating a bakery business.

In 1952, the Schafer organization commenced a modernization program of its plant in Lansing, Michigan, with the objective of consolidating all its baking operations in that plant. This program was scheduled for completion on October 1, 1953, but the new plant did not open until May, 1954. The cost of this program was far in excess of the original estimates and Schafer was forced to obtain additional funds, which were procured from Woodward.

On April 29, 1954, Schafer's Services, Inc., and Schafer's Kalamazoo, Inc., executed installment notes in the amounts of $29,500 and $73,650, respectively, to Woodward, in consideration of loans to the respective corporations of $25,000 and $62,500, which notes were payable in Illinois and were guaranteed by certain of the other debtors. The notes and guarantees were secured by certain pledges and real and chattel mortgages,

all of which were signed by the debtors in Michigan and mailed to Woodward in Chicago, Illinois, where the documents were examined and approved. As a result of these transactions, the Schafer organization obtained $87,500 from Woodward and was obligated to pay Woodward $103,150 in monthly installments commencing June 1, 1954, in the amount of $4,300 for a period of twenty-three months and $4,250 as the twenty-fourth and final payment. Each of the collateral notes contain the following provision:

"It is expressly agreed that in case the holder hereof, its successors or assigns, shall be a party to, or shall intervene, by reason of this note, or any of the collateral pledged hereunder, in any suit or proceedings of any kind, nature or description, or if the holder hereof shall incur or pay any expenses or attorney's fees by reason of the employment of counsel for advice, or to secure the payment of the moneys due hereunder, or to secure full and complete title to the collateral herein pledged free of any claim of the undersigned, whether such payment or full and complete title to said collateral shall be sought from the maker hereof or any assignee, receiver or trustee of the undersigned, and whether in court proceedings or otherwise, such expenses and attorney's fees and any and all moneys advanced, shall be allowed and paid to the holder hereof, and the same shall be and is hereby made a further charge and lien upon the collateral herein pledged."

Each of the chattel mortgages contain a provision similar to that in the collateral notes, for payment of attorney fees and expenses in case of foreclosure, intervention in any suit or proceeding, advice, to secure possession of the mortgaged property, etc.

The Schafer organization paid the first installment on June 3, 1954, defaulted on the July 1, 1954 installment, and on July 13, 1954, filed its petition for reorganization under Chapter X of the Bankruptcy Act.

On July 30, 1954, Woodward filed a petition in these proceedings for leave to foreclose chattel mortgages, sell collateral and for other relief. On March 7, 1955, an order was entered by this court directing the trustee to pay Woodward $2,500 per month commencing as of July 1, 1954, to apply on such indebtedness. On April 28, 1955, the trustee was authorized to sell certain real estate for the sum of $15,000 and apply the proceeds on the indebtedness, which was done upon Woodward discharging a mortgage against the premises. On April 9, 1956, an order was entered authorizing the trustee to pay the balance of $27,900 then due and owing to Woodward and to purchase United States securities in the amount of $20,000 to be held by the trustee in substitution of Woodward's original security which was released by the court pending the determination by this court of the amount due Woodward for interest, expenses and attorney fees arising from its loans to the said debtors. Woodward received the balance of $27,900 on April 11, 1956, and the securities were purchased by and are now in the possession of the trustee.

On October 1, 1956, Woodward filed an amended and supplemental petition alleging that substantially all the monthly installments were not paid when due, that Woodward was entitled to interest at the rate of one and one-half per cent ($1\frac{1}{2}\%$) per month on all such defaulted installments from the due date of each installment until actually paid, that no such interest was paid and that delinquent interest in the amount of $5,592.42 was then due and owing from the debtor organization in accordance with the contracts. This amended petition further alleged that on the filing of Chapter X proceedings it became necessary for Woodward to retain attorneys "for counsel and advice, and to intervene in these proceedings to protect the contractual rights of Woodward in its various security devices and to secure the payment

of the moneys due it." Woodward claims that said attorneys rendered extensive services and that the fair value of such services is $10,000, that expenses were incurred by said attorneys in connection with such services in the amount of $182.64 and that under the several security instruments involved in this matter the said attorney fees and expenses are an additional charge and lien upon the property pledged and mortgaged to Woodward by the debtor organizations, which lien, under an order of this court dated April 9, 1956, has been transferred to $20,000 of United States securities held by the trustee.

Thus, Woodward now requests this court to direct the trustee to pay Woodward the sum of $15,775.06 for delinquent interest, attorney fees and expenses alleged to be due and owing as aforesaid.

· The Unsecured Creditors' Committee filed a response to this amended and supplemental petition in which it is asserted, among other things, that the sums paid to Woodward by the trustee in accordance with the orders of this court represent an amount in excess of principal and interest upon the indebtedness to the date of payment, since interest upon the loans to dates of maturity was included in the principal amount of the notes and interest was compounded in the notes subsequently delivered and included in the principal amount thereof and finance charges and other charges were also included in the principal amount thereof and, therefore, Woodward is attempting to recover interest on interest and penalty interest, which is not recoverable in Chapter X reorganization proceedings. The response of the Committee also alleges that no compensable service was rendered by Woodward's attorneys within the meaning of § 243, Chapter X, of the Bankruptcy Act and that provisions for attorney fees in instruments are void in Michigan unless expressly sanctioned by statute and that no Michigan statute authorizes a charge for attorney fees and expenses so asserted by Woodward.

Both Woodward and the Committee have submitted extensive briefs in this matter.

It is the position of Woodward that its claim for reasonable attorney fees and expenses is purely contractual, is not sought under any provisions of Chapter X of the Bankruptcy Act and is not based on any services rendered for the benefit of the estate for which the court may allow reasonable compensation under § 243, Chapter X, of the Bankruptcy Act. Woodward contends that under Michigan Conflict of Laws Rules the law of Illinois governs as to the validity of the agreements to pay reasonable attorney fees and expenses since the contracts were made in Illinois, that such contracts are valid under Illinois law, that such contracts are not contrary to Michigan public policy and are also valid under Michigan law and are therefore enforceable in Michigan. Woodward further contends that such agreements to pay reasonable attorney fees and expenses, if valid under applicable state law, are enforceable against the trustee in a Chapter X proceeding. Woodward also asserts that a secured creditor in a Chapter X proceeding is entitled to recover interest on delinquent installments of principal to the date of payment where the security is sufficient to pay both principal and interest.

The Creditors' Committee points out that the attorney fees and expenses claimed by Woodward were incurred in these proceedings and contends that § 243 of Chapter X, which provides for allowances to creditors for expenses and attorneys' services beneficial to the estate, is exclusive authority for allowances to creditors for their attorney fees and expenses in Chapter X proceedings. The Committee also contends that, under Conflict of Laws Rules, the law of Michigan governs the validity of these contracts to pay attorney fees and expenses since the mortgaged chattels were located in Michigan, that such contracts are invalid under Michigan law and are not enforceable under Michigan law, even though valid under Illinois law, be-

ing contrary to Michigan public policy. As to Woodward's claim for interest, the Committee contends that such claim is governed by equitable considerations and should be disallowed because it is in effect a penalty.

■ First of all, the validity and enforceability of these agreements for payment of attorney fees and expenses must be determined under applicable state law.

The validity and construction of such contracts present questions of local law. Security Mortgage Co. v. Powers, 278 U. S. 149, 49 S.Ct. 84, 73 L.Ed. 236; Butzel v. Webster Apartments Co., 6 Cir., 112 F.2d 362.

■ These contracts were payable in Illinois. The last act necessary to make them binding obligations of the debtors was the acceptance and approval by Woodward in Illinois. Under Michigan law, the contracts were therefore made in Illinois. Dudley A. Tyng & Co. v. Converse, 180 Mich. 195, 146 N.W. 629; Amos v. Walter N. Kelley Co., 240 Mich. 257, 215 N.W. 397; Transit Bus Sales v. Kalamazoo Coaches, 6 Cir., 145 F.2d 804.

■ According to the Michigan Conflict of Laws Rule, which is in harmony with the general prevailing rule, the validity and construction of a contract is governed by the *lex loci contractus*. Millar v. Hilton, 189 Mich. 635, 155 N. W. 574; Transit Bus Sales v. Kalamazoo Coaches, 6 Cir., supra.

Woodward cites a long line of Illinois cases in support of its claim that these agreements are valid and enforceable under the law of Illinois, which the Committee does not question. However, the Committee does question the validity and enforceability of such contracts under Michigan law, contending that the law of Michigan governs as to validity and that the contracts violate Michigan public policy and are therefore not enforceable under Michigan law, even though the validity is governed by Illinois law. The Committee argues that the law of Michigan governs as to validity because Michigan was the *locus* of the chattels mort-

gaged and cites Restatement, Conflict of Laws, §§ 265 and 279, as follows:

"§ 265. The validity and effect of a mortgage of a chattel are determined by the law of the state where the chattel is at the time when the mortgage is executed.

"§ 279. The validity and effect of a pledge or lien on interests in a chattel are determined by the law of the state where the chattel is at the time when the pledge or lien is created."

These Restatement sections relate to the law governing the formal requisites necessary to create or foreclose a lien, but do not relate to the law that governs the validity and scope of the obligation which the lien secures. This aspect of the security transaction is governed by conflict of laws rules relating to ordinary contracts. Judge Goodrich of the United States Court of Appeals for the Third Circuit, in his outstanding work on Conflict of Laws, at pages 467–468, says:

"Such matters as the formal validity of a mortgage, the capacity of the mortgagor, and the nature of the interest in the land which the mortgagee acquires, are governed by the law of the situs which also governs foreclosure proceedings * *.

"Where a mortgage secures a debt contracted in a state other than that of the situs, the law of the place of contracting determines the validity of the obligation and the enforceability of the contract as distinguished from the security."

■ Under the authorities cited, this court holds that the validity of these agreements for attorney fees and expenses is governed by the law of Illinois, where the contracts were made and were to be performed. For reasons hereinafter set forth, the court also concludes the contracts are valid under Michigan law.

The Committee argues that these contracts are not enforceable in Michigan because they violate the public policy of

Michigan and cites Curtis v. Mueller, 184 Mich. 148, at page 152, 150 N.W. 847, at page 848, where the court said:

"While the general rule is that a contract valid where made is valid in the courts of any other country or state where it is sought to be enforced, there are exceptions to the rule, and one of them is where the contract violates the public policy of the state of the forum."

Public policy must be found in the existing law of the forum. The Michigan Supreme Court has stated the rule more specifically in the case of New York Life Insurance Co. v. Hamburger, 174 Mich. 254, at page 258, 140 N.W. 510, at page 512, as follows:

"What is public policy? The term has frequently been used in a loose, vague, and inaccurate sense. We may, however, safely say that, when we speak of the public policy of this state, we mean the law of the state, whether found in its Constitution, the statutes, or the judicial records."

The principle is similarly stated by the United States Supreme Court in Building Service Employees International Union, Local 262 v. Gazzam, 339 U.S. 532, 537, 70 S.Ct. 784, 787, 94 L.Ed. 1045:

"The public policy of any state is to be found in its constitution, acts of the legislature, and decisions of its courts."

A long line of Michigan cases holds that provisions in mortgages for payment of a specified sum as attorney fees not authorized by statute or rule of court violate Michigan public policy and are void. Bullock v. Taylor, 39 Mich. 137; Myer v. Hart, 40 Mich. 517; Canfield v. Conkling, 41 Mich. 371, 2 N.W. 191; Louder v. Burch, 47 Mich. 109, 10 N.W. 129; Wright v. Traver, 73 Mich. 493, 41 N.W. 517, 3 L.R.A. 50; Curtis v. Mueller, 184 Mich. 148, 150 N.W. 847.

The reasoning of the Michigan Supreme Court in these cases is that such fixed sums for attorney fees have no relationship to the actual expense which may be incurred by the mortgagee and are therefore void as constituting a penalty. On the other hand, a trust mortgage provision for payment of a reasonable attorney fee in event of foreclosure was held valid in the case of Security Trust Co. v. Solomon, 241 Mich. 52, 216 N.W. 405. There appear to be no other Michigan cases construing the effect of a provision in a security instrument for reasonable attorney fees. The Committee contends that the Solomon case is distinguishable on the grounds that it involves a trust mortgage and the trustee of such a mortgage has a legal right to reasonable recompense for his services and expenses, including legal expenses, and also contends that the Michigan Supreme Court in that case only gives effect to a contract provision that does no more than express an already existing legal right and therefore does not deviate from its prior holdings that provisions for stipulated sums are void. However, it is significant that the court in upholding the provision for payment of reasonable attorney fees in the Solomon case did not adopt this reasoning of the Committee and by way of distinction referred to the well established Michigan rule "that a specified sum, stipulated in a mortgage to be chargeable as attorneys' fees on foreclosure, is not enforceable," citing Curtis v. Mueller, 184 Mich. 148, 150 N.W. 847. This seems to indicate that the Michigan Supreme Court in Solomon based its decision, in part at least, on the fact that the evils inherent in a stipulated fee were eliminated when the contract provided for reasonable fees only, without stipulation as to the dollar amount of a reasonable fee.

The distinction made by the Michigan Supreme Court in the Solomon case between agreements to pay attorney fees in fixed amounts and those providing for reasonable fees was also recognized by the United States Court of Appeals for the Sixth Circuit in Butzel v. Webster Apartments Co., supra, 112 F.2d 362, which also involved trust mortgage provisions for payment of a reasonable attorney fee in event of default, the court holding such provisions valid un-

der applicable Michigan law and at page 365 said:

"The rule prevails in Michigan that an agreement by a mortgagor to pay a stipulated attorneys' fee on default and foreclosure is contrary to public policy and invalid. Curtis v. Mueller, 184 Mich. 148, 150 N.W. 847; Myer v. Hart, 40 Mich. 517, 29 Am.Rep. 553. However, a reasonable fee may be allowed, measured by the fair value of the services rendered. Security Trust Company v. Solomon, 241 Mich. 52, 216 N.W. 405."

There is no Michigan decision or statute which declares an agreement to pay reasonable attorney fees and expenses to be contrary to Michigan public policy.

Freedom of persons to contract is a well recognized principle of law. Baltimore & O. R. Co. v. Voigt, 176 U.S. 498, 20 S.Ct. 385, 44 L.Ed. 560.

In the case of St. Helen Shooting Club v. Mogle, 234 Mich. 60, at page 71, 207 N.W. 915, at page 918, the Supreme Court of Michigan said:

"It is not the policy of the law to unnecessarily restrict the right of persons to contract."

In the case of Skutt v. City of Grand Rapids, 275 Mich. 258, 266 N.W. 344, 346, the court quoted with approval from Twin City Pipeline Co. v. Harding Glass Co., 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112, as follows:

"The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests."

■ Invoking provisions for payment of reasonable attorney fees by the holders of security instruments containing such provisions does not leave the debtor without protection against unscrupulous creditors. The amount must be determined by a court in proper judicial proceedings. Under these circumstances, it is difficult to see how such agreements can possibly offend any reasonable moral standards of the forum state.

■ Tested in the light of the foregoing authorities, this court holds that the agreements in question for payment of reasonable attorneys' fees and expenses do not violate the public policy of Michigan, are also valid under the law of Michigan and are therefore enforceable under Michigan law.

Having decided that Woodward's claim for attorneys' fees and expenses is valid and enforceable under applicable state law, it is now necessary to determine whether such claim is enforceable in a Chapter X proceeding under the Bankruptcy Act. This raises federal questions peculiar to the law of bankruptcy.

The agreements on which Woodward relies clearly cover the services for which recovery is sought.

Woodward contends that its claim for attorneys' fees is not filed under any provision of the Bankruptcy Act, but is purely contractual in nature and is a part of its lien on the security of the debtor organizations and therefore this court must order payment out of the security as a part of the contracted debt.

The theory on which this contention rests is that § 186 of the Bankruptcy Act (11 U.S.C. § 586, 11 U.S.C.A. § 586) provides that the trustee in a Chapter X proceeding takes such property as a trustee in an ordinary bankruptcy appointed under § 44 of the Bankruptcy Act (11 U.S.C. § 72, 11 U.S.C.A. § 72) and under the holding of the Supreme Court in Security Mortgage Co. v. Powers, 1928, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236, a trustee in ordinary bankruptcy takes property subject to valid liens.

Woodward therefore contends that the trustee in a Chapter X proceeding is vested with the same title to the debtor's property as the trustee in ordinary bankruptcy and consequently takes such property subject to all valid liens. In other

words, Woodward claims to occupy in this Chapter X proceeding the same position as a secured creditor in an ordinary bankruptcy case.

The Committee contends that § 243 is a restrictive measure and limits the power of the court in a Chapter X proceeding to make allowances to creditors for expenses incurred and attorneys' services rendered only in connection with the matters therein specifically referred to.

§ 243 provides:

"The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred by creditors and stockholders, and the attorneys for any of them, in connection with the submission by them of suggestions for a plan or of proposals in the form of plans, or in connection with objections by them to the confirmation of a plan, or in connection with the administration of the estate. In fixing any such allowances, the judge shall give consideration only to the services which contributed to the plan confirmed or to the refusal of confirmation of a plan, or which were beneficial in the administration of the estate, and to the proper costs and expenses incidental thereto."

This section has no significant legislative history. The language of § 243 clearly limits allowances to creditors for expenses and attorneys' services that come within the scope of that provision to such as contributed to the confirmation or defeat of a plan or were beneficial in the administration of the estate. The Committee argues that § 243 is the sole authority for allowances to all creditors, both secured and unsecured, as to attorneys' fees and expenses incurred in a Chapter X proceeding and, as authority for such contention, cites a number of cases: In re Mt. Forest Fur Farms, 6 Cir., 157 F.2d 640; Glasser v. Doyle, 2 Cir., 223 F.2d 811; In re Porto Rican American Tobacco Co., 2 Cir., 117 F.2d 599; Warren v. Palmer, 2 Cir., 132 F.2d 665; Gochenour v. Cleveland Terminals Building Co., 6 Cir., 142 F.2d 991; and the recent case of Le Boeuf v. Austrian, 4 Cir., 240 F.2d 546.

These cases are not in point. None of them involve a contractual lien claim of a secured creditor for attorneys' fees and expenses. All involve application of § 243 to situations where an order is requested authorizing payment for attorneys' services rendered to a creditor in the course of a Chapter X proceeding and alleged to be a part of the administration of the estate. This is not the problem in the instant case. Woodward admits that it has no basis for a claim under § 243, but rather contends that such fees and expenses comprise a contractual debt which may be claimed entirely apart from the provisions of § 243.

§ 186 of the Bankruptcy Act (11 U. S.C. § 586, 11 U.S.C.A. § 586) provides:

"A trustee, upon his appointment and qualification, shall be vested with such title as a trustee appointed under section 44 of this Act would have."

Thus, since § 44 relates to the appointment of trustees in ordinary bankruptcy proceedings, it appears that the trustee in a Chapter X proceeding takes title subject to any encumbrances that may be asserted in an ordinary bankruptcy. While there appears to be no case specifically holding that a trustee in a Chapter X proceeding takes title subject to all claims, liens and equities of a trustee appointed in ordinary bankruptcy, the language of the Act is clear. 6 Collier on Bankruptcy (14th Ed.), § 8.02, supports the above conclusion in a statement at Page 2418 as follows:

"Generally speaking, the trustee takes the debtor's property subject to all valid claims, liens and equities. In one sense, the trustee thus stands in the debtor's shoes and has no better title than the debtor had at the time the petition was filed."

Probably the leading case on the enforceability of agreements to pay at-

torneys' fees and expenses in an ordinary bankruptcy proceeding is Security Mortgage Co. v. Powers, supra, 1928, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236. In that case, the Supreme Court held that the validity of a stipulation for attorneys' fees contained in a loan deed was a matter of state law and, if valid under state law, the bankruptcy court must enforce such a lien in an ordinary bankruptcy proceeding. In that case, the facts were essentially similar to the instant case, except that the proceeding was not initiated under Chapter X. The court also held that the fact that the services were rendered after adjudication in bankruptcy did not destroy the validity of the lien and at page 156 of 278 U.S., at page 86 of 49 S.Ct. the opinion said:

> "The lien was not inchoate at the time of the adjudication. It had already become perfect when the principal note and the loan deed securing it were given. Property subject to a lien to secure a liability still contingent at the time of bankruptcy is not discharged from the lien by the adjudication. The secured obligation survives; and if it is that of a third person is usually unaffected by the bankruptcy. When by the happening of the event the contingent liability becomes absolute, the lien becomes enforceable, though this occurs after the adjudication."

The Security Mortgage case, which was decided in 1928, states that if a lien was valid under state law it was preserved under then § 67d of the Bankruptcy Act. § 67d referred to in that opinion was deleted from the Bankruptcy Act by the Chandler Act of 1938. This deletion had no effect on the validity of liens asserted in ordinary bankruptcy proceedings since former § 67d was intended only as a savings clause, expressly preserving all liens valid under state law. According to 4 Collier on Bankruptcy (14th Ed.), § 67.02 at Page 37, deletion of 67d from the Act was predicated on complaints that it contained "so many elements that an absence of one might be argued as a reason for invalidating liens."

The closest authority found applicable to the facts in the instant case is Brown v. Security National Bank of Greensboro, 4 Cir., 1952, 200 F.2d 405. This case involves an attempt by a creditor in a Chapter X proceeding to recover attorneys' fees under a deed of trust providing that the trustee should have a lien on the property conveyed for counsel fees incurred in any judicial proceeding.

Attorneys for the trustee filed a petition for leave to foreclose the trust deed which was denied, but orders were afterward entered requiring interim payments and the attorneys finally succeeded in collecting the entire amount due and owing, which was exactly the situation in the instant case. The court did not discuss the effect of § 243, Chapter X, of the Bankruptcy Act, as pointed out by the Creditors' Committee, but nevertheless held that attorneys' fees incurred for services rendered under such circumstances constituted a lien on the security and should be paid, and cited Security Mortgage Co. v. Powers, supra, as authority for the proposition that attorneys' fees in such a situation valid under applicable state law are allowable in a bankruptcy proceeding. Commenting on the nature of the proceedings taken by the attorneys, the court at page 407 of the opinion said:

> "It is immaterial that such proceeding was not an independent one but was taken in connection with the bankruptcy reorganization which had been commenced."

Also see In re American Motor Products Corp., 2 Cir., 1938, 98 F.2d 774, and United States v. Sampsell, 9 Cir., 1946, 153 F.2d 731, where the courts in ordinary bankruptcy proceedings, relying on the authority of Security Mortgage Co. v. Powers, supra, enforced liens for attorneys' fees pursuant to mortgage stipulations, for services rendered during prior Chapter X proceedings which had failed.

**912**

Under § 186 and above authorities, it seems clear that a Chapter X trustee, having the same title to property as a trustee in ordinary bankruptcy, takes title subject to a lien for attorney fees and expenses valid under applicable state law. The provisions of § 243 relate only to expenses incurred and services rendered in connection with the administration of the estate and have no bearing on a valid lien for such fees and expenses established prior to filing the petition for reorganization. Therefore, this court concludes that Woodward's claim for attorney fees and expenses became a part of the original debt secured by valid liens established prior to filing these reorganization petitions and are enforceable in these proceedings. However, this court will in the exercise of its powers determine in a proper proceeding what expenses were properly incurred and what amount constitutes a reasonable fee for such services.

The final question involves Woodward's claim for $5,592.42 for interest at the rate of 1½% per month on installment payments required by the notes from the due dates of such installments until same were paid.

Woodward contends that a secured creditor in a Chapter X proceeding is entitled to recover interest on its claim to the date of payment where the value of the security is adequate to pay both principal and interest, and cites a large number of cases from various circuits as authority, including the Sixth Circuit case of In re Macomb Trailer Coach, 200 F.2d 611. The Committee agrees that such is the law applicable to simple interest, but argues that this principle of law is not applicable to the situation here because Woodward's claim of $5,-592.42 consists in part of interest on interest and the remainder is interest in the nature of a penalty. In support of this contention, the Committee cites the case of Vanston Bondholders Protective Committee v. Green, 329 U.S. 1956, 67 S.Ct. 237, 246, 91 L.Ed. 162.

Reference to the facts above stated indicate that the original transactions between Woodward and the debtor organizations resulted in a total loan of $87,500 to Shafer to be repaid in twenty-four monthly installments of $4,300 each, except the final installment which was $4,250. The total of these installments is $103,150 which Woodward contends was acknowledged to be a repayment of "principal" by Shafer and therefore contains no "interest." The difference between these sums is $15,650, which amount, if interest, would represent an annual rate of nearly 9% per annum—8.942 per cent, to be more exact—on the $87,500 advanced to Shafer. The Committee in its brief states that the trustee paid interest charges in the amount of $22,654 which computes to a rate in excess of 20% per annum, which statement is not supported by the pleadings in these proceedings and is therefore not considered in the decision of this issue. Woodward claims these loan transactions are not ordinary bank loans where the only consideration for the payment of interest is the advancement of money; but, on the other hand, are known as "commercial financing," which contracts are supported by considerations other than the advancement of money. Be that as it may, Woodward cautiously avoids any explanation or cost breakdown of this figure of $15,650.

The notes were executed on April 29, 1954, and each note provided that interest shall be payable at the rate of 1½% per month upon each installment payment from the due date thereof until paid. This is an annual rate of 18% which Woodward is seeking to recover in these proceedings. On June 3, 1954, Shafer paid the first monthly installment of $4,300 due June 1, 1954, then defaulted on the July 1, 1954 installment and filed its petition for reorganization in this Chapter X proceeding on July 13, 1954. Most of the installments thereafter became in default, but the trustee, acting under various orders of the court, made payments on these notes from time to time as above stated, and on April 11, 1956, paid the remaining

balance of these notes, except the 1½% per month charge here involved.

The sum of $5,592.42 claimed by Woodward is, for the purpose of legal analysis of this issue, an aggregate of three separate sums. The first portion represents interest on the first overdue payment from the due date to the date of filing the petition for reorganization. The second portion represents interest on that part of each overdue installment that constitutes repayment of principal. The third portion represents interest on that part of each overdue installment which constitutes interest on the principal amount loaned, or, in other words, interest on overdue interest.

█ A bankruptcy court is vested with equity powers, and, in a Chapter X proceeding, the court "is just as much a court of equity as were its statutory and chancery antecedents." Vanston Bondholders Protective Committee v. Green, supra.

█ The entire interest issue is controlled by the decision in the Vanston case. The first portion of the sum claimed which represents interest on the second installment of $4,300 from July 1, 1954, to July 13, 1954, was overdue by virtue of Shafer's own act and not by reason of these proceedings, and is therefore allowable. It is well settled that interest will be allowed on all claims to the date of filing a petition in bankruptcy.

In Vanston, 329 U.S. at page 161, 67 S.Ct. at page 239 of the opinion, the court said:

"What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law."

At page 166 of 329 U.S., at page 242 of 67 S.Ct. of the Vanston opinion, including footnote, the court indicates that the debtor, except for intervention of the receivership, would be liable to pay interest on overdue interest accruing prior to the receivership, pursuant to such a covenant valid under applicable state law. The court said:

"Before the receivership began a failure by Inland to pay coupons on the date they were due might have breached an existing obligation. This breach would have imposed upon Inland, under the terms of the covenant, a duty to pay interest on the interest it had failed to pay."

Footnote 10:

"Had a breach occurred and a suit been filed in state court prior to receivership or bankruptcy, that court would have been required to determine whether the covenant was valid under the controlling state law."

This court assumes, as a basis for allowing the first portion of this sum, that Shafer's agreement to pay 1½% per month on overdue installments was valid under controlling state law, lacking any claim of the Committee to the contrary.

█ The third portion of this sum representing interest on overdue interest which accrued after the reorganization petitions were filed clearly constitutes a penalty for the late payment of interest, and is therefore disallowed by the application of equitable principles governing bankruptcy distributions under the Vanston decision.

█ Thus, there remains for consideration only the second portion of this sum requested by Woodward constituting interest on that part of the overdue installments which represent repayment of the sums actually received by Shafer. Applying the reasoning and principles laid down in the Vanston case, supra, it appears that this portion of Woodward's claim must also be denied. The fact that Shafer acknowledged that the entire $103,150 was repayment of "principal" cannot prevent this court, in the exercise of its equity powers, from looking through the form of this transaction to determine the true nature of the amounts represented by the notes.

It is clear that a substantial part of the $15,650 differential constitutes simple interest on the principal debt within the ordinarily accepted meaning of the term "interest," defined in Bouv. Law Dict., Rawle's Third Revision, at page 1642, as "the compensation which is paid by the borrower of money to the lender for its use, and, generally, by a debtor to his creditor in recompense for his detention of the debt."

Applicable to this precise point, we quote further from the decision in the Vanston case:

"The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of proceedings. Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment—a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved." 329 U.S. at page 163, 67 S.Ct. at page 240.

"It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." 329 U.S. at page 165, 67 S.Ct. at page 241.

Since the amount of the notes in the sum of $103,150 has been paid in full, it is clear that Woodward has already received simple interest on these loans and has been well recompensed for the use of its money. Any further payment by the trustee under the prevailing circumstances, except interest on the second installment to July 13, 1954, heretofore allowed, would only constitute a penalty for the late payment of those portions of the overdue installments representing the principal sum loaned.

In concluding its opinion in the Vanston case, the Supreme Court said:

"For legal suspension of an obligation to pay is an adequate reason why no added compensation or penalty should be enforced for failure to pay." 329 U.S. at pages 166–167, 67 S.Ct. at page 242.

An appropriate order may be presented.